UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

KULBERG FINANCES INC

                  Plaintiff,

    -against-

SPARK TRADING D.M.C.C., CAIRO THREE
A FOR TRADING, CAIRO THREE A FOR
TRADING S.A.E., and CAIRO THREE A
IMPORT & EXPORT S.A.E.,

                Defendants.

------------------------------------X

09 Civ. 00792

OPINION

A P P E A R A N C E S:

        Attorneys for Plaintiffs

        BROWN GAVALAS & FROM LLP
        355 Lexington Avenue
        New York, NY 10017
        By: Peter Skoufalos, Esq.

        Attorneys for Defendants

        BLANK ROME LLP
        405 Lexington Avenue
        New York, NY  10174
        By:  Jeremy J.O. Harwood, Esq.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/18/09

**Sweet, D.J.**

Defendants Spark Trading, Cairo Three A for
Trading, Cairo Three A for Trading S.A.E., and Cairo Three
A Import & Export S.A.E. (collectively "Spark" or
"Defendants") have moved pursuant to Rules E(4)(f) and
12(b)(1) of the Federal Rules of Civil Procedure to vacate
the maritime attachment obtained by plaintiff Kulberg
Finances ("Kulberg" or "Plaintiff") for lack of subject
matter jurisdiction. For the reasons set forth below, the
existence of subject matter jurisdiction has been
established, but the attachment is vacated for failure to
state a valid maritime claim under English law.

The underlying dispute arises out of a contract
for the sale of Ukranian feed barley by Kulberg to Spark.
Under the terms of the contract, Kulberg was responsible
for the delivery by cargo ship of the barley to Spark, who
was then responsible for the timely discharge of the cargo.
Kulberg alleges that Spark exceeded the contractual time
for discharge, thereby incurring a demurrage[1] charge of
$232,452.56, for which Spark is liable to Kulberg.

---

[1] "'Demurrage' is remuneration of the shipowner for the detention of its
vessel beyond the number of days allowed by the charter-party."
Transatlantic Shiffahrtskontor GMBH v. Shanghai Foreign Trade Corp.,

1

**PRIOR PROCEEDINGS**

On January 27, 2009, Kulberg filed its complaint
in the Southern District of New York. On January 29, 2009,
an Order of Attachment was signed in the amount of
$337,924.50, which included the demurrage charge, interest,
and legal costs. On May 29, 2009, Spark moved to vacate
the attachment on the ground that the Court lacked subject
matter jurisdiction over Kulberg's claims. The motion was
marked fully briefed on June 8, 2009.

**THE FACTS**

On August 30, 2008, the parties entered into
Contract No. 532.080830 for the sale and delivery of 7,000
metric tons of Ukranian origin feed barley to the port of
Tartous, Syria ("the Contract"). The Contract contains
numerous provisions regarding the terms of the sale,
including the characteristics of the grain to be purchased,
guarantees of quality, and payment terms. See Exh. 1 to

---

204 F.3d 384, 386 n.2 (2d Cir. 2000) (citing Black's Law Dictionary 432
(6th ed. 1990)).

the Declaration of Robert Andrew Jardine-Brown ("Jardine-
Brown Decl.") (Contract # 532.080830).


        In addition to the terms and conditions of sale,
the Contract contains several clauses relating to ocean
transportation and the discharge of the cargo.  "Discharge
conditions" found in the Contract include the following
provisions:

- Buyers guarantee a discharging rate of 1500
  metric per [weather working day] of 24
  consecutive hours, Fridays, Saturdays, Holidays
  excluded, even if used for vessel of 7,000 tons
  with 10 % tolerance more or less for cargo
  intake.

- Time to start counting as from 8:00 hours next
  working day after valid Notice Of Readiness has
  been tendered during usual office hours, [whether
  in berth or not, whether in free pratique or not,
  whether customs cleared or not].

- Time from Thursday (or day preceding a Holiday
  14:00 hours till Sunday (or next working day)
  08:00 hours not to count as lay-time, even if
  used.


        "Special conditions" for the voyage include the
following provisions:

- Demurrage-/dispatch-rate as per Charter Party,
  free dispatch.  Seller to present copy of charter
  party/valid fixture recap to Buyers upon request.

- Buyers' agent at discharge port.

- Vessel to be single-decker, bulk-carrier,
  suitable for grab-discharge, classified by
  Lloyd's A1 or equivalent, have valid ISM
  certificate and be fully covered by respectable
  P&I club.

- Max. Age of the vessel is 30 years.

- Sellers to ensure that Ship-owners have no right
  nor any reason to exercise any lien over the
  cargo in respect of freight, dead-freight,
  demurrage or damages for detention and Sellers
  shall indemnify and hold harmless the Buyers in
  respect of any loss, damage or delay caused to
  the Buyers by the Ship-owners exercising any such
  lien in this regard.

Id. The Contract therefore specified that Defendants were

responsible for the timely discharge of the barley upon the

vessel's arrival to Tartous as well as any demurrage

charges resulting from their failure to discharge the cargo

within the allotted laytime.

    In addition, the Contract incorporated the form

contract of the Grain and Feed Trade Association ("GAFTA")

which provides for arbitration before GAFTA of disputes

arising under the Contract:

            Conditions: All other terms, rules and
            conditions, not conflicting with the contents of
            this contract are as per GAFTA Nr. 100.

4

> • Arbitration, in London, as per GAFTA Nr.
> 125.

Id. GAFTA Nr. 100 provides that the contract "shall be

deemed to have been made in England and to be performed in

England, notwithstanding any contrary provision, and this

contract shall be construed and take effect in accordance

with the laws of England." Exh. 1 to the Declaration of

Vladyslav Markelov ("Markelov Decl.") (Gafta No. 100). The

charter party agreement between Kulberg and the ship owners

similarly directs that English law govern any disputes.

Jardine-Brown Decl. Exh. 2 (Charter Party dated 4/9/2008)

("ARBITRATION/GENERAL AVERAGE IN LONDON AS PER ENGLISH

LAW."). Neither party challenges the application of

English law as the substantive law of the Contract.

Based on the cargo quantity of 6,926.8 metric

tons, Defendants were permitted a laytime of 4 days, 15

hours, and 50 minutes to offload the purchased barley.

According to Plaintiff, Defendants exceeded the allotted

laytime by 31 days, 18 hours, and 55 minutes.

On November 24, 2008, Plaintiff demanded that

Defendants pay all sums due and owing for demurrage at the

port of discharge. In response to Defendants' refusal to

5

pay, Plaintiff initiated arbitration proceedings, pursuant to the Contract's arbitration clause, before GAFTA in London seeking payment of the demurrage costs.   An arbitration decision is currently pending.

Plaintiff subsequently commenced the present action seeking an order of maritime attachment pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure as a means of securing Spark's assets in anticipation of a favorable arbitration decision.   Defendants move to vacate the attachment on the grounds that this Court lacks subject matter jurisdiction over Plaintiff's claims.

**DISCUSSION**

## I.   MARITIME ATTACHMENTS AND ADMIRALTY JURISDICTION OF THE COURTS

### A.   Background

"The use of the process of attachment in civil causes of maritime jurisdiction by courts of admiralty . . . has prevailed during a period extending as far back as the authentic history of those tribunals can be traced." Atkins v. The Disintegrating Co., 85 U.S. 272, 303 (1873).

6

"Maritime attachments arose because it is frequently, but not always, more difficult to find property of parties to a maritime dispute than of parties to a traditional civil action." Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 443 (2d Cir. 2006). Thus, the traditional rule of maritime attachments has been to permit attachments wherever the property of the defendant may be found, and not require a plaintiff "to scour the globe" to find a proper forum where defendant possesses sufficient property to satisfy a judgment. Id.

The present rules for obtaining a maritime attachment are found in the Federal Rules of Civil Procedure Supplemental Rule B, which was promulgated under the Rules Enabling Act, 28 U.S.C. § 2071. To obtain an attachment, plaintiff must file a verified complaint seeking attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district. Fed. R. Civ. P. Supp. R. B(1). Plaintiff must also demonstrate that it has a valid prima facie admiralty claim against the defendant. Aqua Stoli, 460 F.3d at 445. Thereafter, Rule E(4)(f) provides that any person claiming an interest in the attached property is "entitled to a prompt hearing at which

7

the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Fed. R. Civ. P. Supp. R. E(4)(f). During the vacateur hearing, plaintiff bears the burden of establishing that the attachment should not be vacated. Aqua Stoli, 460 F.3d at 445. At the hearing the defendant "can attack the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings." Fed. R. Civ. P. Supp. R. E(4)(f), Advisory Committee's Note.

## B. The Dispute Falls Within the Court's Admiralty Jurisdiction

### 1. United States Law Determines the Court's Admiralty Jurisdiction

The threshold issue to be addressed is the law to be applied in determining whether subject matter jurisdiction exists over Plaintiff's claim. Defendants assert that the determination of the Court's admiralty jurisdiction turns on whether a valid maritime claim exists under the applicable substantive law. Defendants argue that because English law governs the Contract, and English law does not recognize Plaintiff's claim as "maritime,"

this Court lacks subject matter jurisdiction over the complaint and the attachment must be vacated.

"Neither Rule B nor any other of the supplemental Rules create a valid prima facie admiralty claim. Rather, the Supplemental Rules fashion procedures by which a valid maritime claim may form the basis for a writ of maritime attachment." Sonito Shipping Co. Ltd. v. Sun United Mar. Ltd., 478 F. Supp. 2d 532, 536 (S.D.N.Y. 2007). Because Rule B constitutes a procedural remedy for maritime claims, United States maritime law, and not the applicable substantive law of England, governs the determination of this Court's subject matter jurisdiction. See Tennessee Coal, Iron & R.R. Co. v. George, 233 U.S. 354, 360 (1914) ("[J]urisdiction is to be determined by the law of the court's creation."); Otal Invs. Ltd. v. M.V. Clary, 494 F.3d 40, 50 (2d Cir. 2007) ("[T]he law of the forum – federal maritime law – governs procedural law").

Wall Street Traders, Inc v. Sociedad Espanola de Construccion Naval, 245 F. Supp. 344 (S.D.N.Y. 1964) is particularly informative. Much as Defendants do here, the defendant in Wall Street argued that the court lacked admiralty jurisdiction because Spanish law, the governing

9

law of the contract, did not consider "a suit on such a contract [] a maritime action." Id. at 350. Finding the argument to be "without merit," the court observed:

> If the law of the place of the transaction is applied, the jurisdiction of a federal admiralty court would be dependent upon the peculiarities of particular foreign law and jurisdiction would vary from nation to nation. Such an interpretation of this court's admiralty jurisdiction would be contrary to the principal purpose behind the creation of federal admiralty jurisdiction – the establishment of a 'general system of maritime law with uniform operation.'

Id. (citing Detroit Trust Co. v. The Thomas Barlum, 293 U.S. 21, 43 (1934)).

        The cases cited by Spark on pages 9-11 of its Memorandum of Law in Support of Motion to Vacate Order of Maritime Attachment ("Mot. to Vacate") are not to the contrary. While the courts in most of the cases utilized the substantive law of the contract, the question presented was not one of subject matter jurisdiction, but rather the existence of a valid maritime claim for purposes of a Rule B attachment. See, e.g., Sonito Shipping, 478 F. Supp. 2d at 536-37 ("The case at bar turns on whether . . . the complaint pleads a 'valid prima facie admiralty claim.'");

Ice Flake Mar. Ltd. v. Westcoast AS, No. 07 Civ. 2002
(PKC), 2007 U.S. Dist. LEXIS 75677, at *2 (S.D.N.Y. Oct.
11, 2007) ("[Defendant] challenges the existence of a valid
prima facie maritime claim.").

In Nais Marine S.A. v. Trans Pacific Carriers Co.
Ltd, No. 07 Civ. 10640 (PKL), 2008 U.S. Dist. LEXIS 2438
(S.D.N.Y. Jan. 10, 2008), the Honorable Peter K. Leisure
considered the question of the relevant law to be applied
in determining the existence of subject matter
jurisdiction. Defendant Trans Pacific moved to vacate a
Rule B attachment on the ground that the court lacked
subject matter jurisdiction over plaintiff Nais's claim for
legal defense costs. In vacating the attachment, Judge
Leisure declined to decide whether American or English law
should apply, concluding instead that Nais failed to state
a maritime claim under the law of either jurisdiction. Id.
at *7-9.

None of the cases cited by Spark supports the
proposition that the substantive law of the Contract serves
to define the existence of American courts' admiralty
jurisdiction. Consequently, we apply American maritime law

11

in determining the existence of admiralty jurisdiction under the present circumstances.

### 2. Kulberg's Claim for Demurrage Is A Severable Maritime Claim under U.S. Law.

The admiralty jurisdiction of the federal courts is grounded in Article III of the Constitution. See U.S. Const. art. III, § 2 (providing that the federal judicial power shall extend to "all Cases of admiralty and maritime Jurisdiction"); see also 28 U.S.C. § 1333(1) (granting federal district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction"). "Federal courts may exercise their maritime jurisdiction granted by section 1333 of title 28 of the United States code if an action is based on a maritime contract." F.H. Bertling Holding KG v. Ranhill Eng'rs & Constr. SDN, BHD., 591 F. Supp. 2d 377, 381-82 (S.D.N.Y. 2008). However, as the Supreme Court has recognized, "the boundaries of admiralty jurisdiction over contracts – as opposed to torts or crimes – being conceptual rather than spatial, have always been difficult to draw." Norfolk S. Ry. v. James N.

Kirby, Pty. Ltd., 543 U.S. 14, 23 (2004) ("Kirby") (quoting

Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961)).

In an action to enforce a contract, the existence
of admiralty jurisdiction is determined by "the nature and
character of the contract, and the true criterion is
whether it has reference to maritime service or maritime
transactions." Id. at 24 (quotation omitted);[2] see also
Folksamerica Reinsurance Co. v. Clean Water of NY, Inc.,
413 F.3d 307, 312 (2d Cir. 2005) (noting that "the
contract's subject matter must be [the courts'] focal
point."). As the Second Circuit has stated, "the proper
inquiry is 'whether the principal objective of a contract
is maritime commerce.'" Williamson v. Recovery Ltd.
P'ship, 542 F.3d 43, 49 (2d Cir. 2008) (quoting
Folksamerica, 413 F.3d at 315).

---

[2] Prior to Kirby, the Second Circuit required a "threshold inquiry" into
whether the subject matter of the dispute is so attenuated from the
business of maritime commerce that maritime jurisdiction should not be
found to exist. See Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,
968 F.2d 196, 200 (2d Cir. 1992). The Second Circuit has since
expressed uncertainty as to whether this "threshold inquiry"
requirement survives Kirby. See Folksamerica Reins. Co. v. Clean Water
of New York, Inc., 413 F.3d 307, 313 (2d Cir. 2005). As discussed
infra, the instant dispute stems from a classic maritime claim for
demurrage and implicates concerns underlying admiralty and maritime
jurisdiction. As a result, the claim easily survives the threshold
inquiry.

"The general rule for exercising admiralty jurisdiction in a contract case is that 'jurisdiction arises only when the subject-matter of the contract is "purely" or "wholly" maritime in nature.'" Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 555 (2d Cir. 2000) (quoting Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 109 (2d Cir. 1997)). However, courts have held that admiralty jurisdiction may be exercised over "mixed" contracts containing both maritime and non-maritime elements if the contract falls within one of two exceptions to the general rule. Folksamerica, 413 F.3d at 314 (citing Transatlantic Marine, 109 F.3d at 109). Under the first exception, a federal court can exercise admiralty jurisdiction over a "mixed" contract if the non-maritime elements of a contract are "merely incidental" to the maritime portions. Transatlantic Marine, 109 F.3d at 109; see also Sirius Ins. Co. (UK) v. Collins, 16 F.3d 34, 37 (2d Cir. 1994). Under the second exception, which Plaintiff argues applies to the instant case, a federal court may exercise admiralty jurisdiction over claims arising from a "breach of maritime obligations that are severable from the non-maritime obligations of the

contract." Folksamerica, 413 F.3d at 314 (quoting Hartford
Fire, 230 F.3d at 555).

It is well established that claims for demurrage
are classic maritime claims that fall within the Court's
admiralty jurisdiction. See, e.g., Stemcor UK Ltd. v. Sesa
Int'l Ltd., 09 Civ. 1155 (LBS), 2009 U.S. Dist. LEXIS
42855, at *7 (S.D.N.Y. May 18, 2009); Crossbow Cement SA v.
Mohamed Ali Aleh Al Hashedi & Bros., 08 Civ. 5074, 2008
U.S. Dist. LEXIS 98319, at *14 (S.D.N.Y. Dec. 4, 2009);
Centramet Trading S.A. v. Egyptian Am. Steel Rolling Co.,
No. 07 Civ. 6379 (RMB), 2007 U.S. Dist. LEXIS 97940, at *3
(S.D.N.Y. Sept. 28, 2007).

Plaintiff's claim, as presented both in its
request for arbitration to GAFTA and its verified complaint
initiating the present action before this Court, is based
solely on Defendants' alleged violation of the provisions
of the contract concerning the discharge of the vessel's
cargo. As previously described, those provisions establish
time limits for offloading the cargo; assign to the buyer,
Spark, the responsibility for any demurrage charges
incurred; and establish a rate for demurrage charges by
reference to the charter party. Rather than alleging, as

15

Spark asserts, the "breach of a non-maritime contract to purchase barley," Mot. to Vacate at 19, Plaintiff sets forth a classic maritime claim for demurrage severable from the "non-maritime" portions of the contract. See, e.g., Noble Res. Pte. Ltd. v. Metinvest Holding Ltd., 08 Civ. 11194 (PGG), 2009 U.S. Dist. LEXIS 30720, at *25 (S.D.N.Y. Apr. 10, 2009) (observing that it is "well-settled" that demurrage claims are maritime in nature and "severable from sale and purchase agreements"); Crossbow Cement, 2008 WL 5101180 at *7 ("Plaintiff's claim arises solely from the demurrage clause, which is severable from the rest of the Sales Contract and Amendment."); Centramet, 2007 WL 5731922 at *2-3; Transcript of Oral Argument at 24, Kulberg Fins., Inc. v. Ipek Yem Ve Gida Sanay: Ticaset A.S., 08 Civ. 10592 (LAK) (S.D.N.Y. Apr. 22, 2009) (acknowledging the existence of "a fair amount of persuasive authority to the effect that a claim for demurrage in a payable under a mixed contract for the sale of goods is a severable Maritime claim where the contract provides that the buyers is to reimburse the seller for demurrage"); Transcript of Oral Argument at 19, Noble Res. S.A. v. Sarl Ouest Import, 08 Civ. 357 (S.D.N.Y. Aug. 12, 2008).

Aston Agro-Industrial AG v. Star Grain Ltd., No. 06 Civ. 2805 (GBD), 2006 WL 3755156 (S.D.N.Y. Dec. 20, 2006), cited by Defendants, is distinguishable on its facts from the case at bar. In Aston, the Honorable George B. Daniels found that the court lacked subject matter jurisdiction over demurrage claims relating to a contract for the sale of wheat. Id. at *4-5. Observing that the "so-called 'demurrage clauses'" in dispute failed to set forth the parties' obligation to compensate each other for demurrage owed to the vessel owner, Judge Daniels concluded that resolution of the dispute required nothing more than ordinary contract interpretation to determine which party bore the risk of the loss of goods. Id. at *4. Consequently, the "demurrage clause" did not constitute a severable maritime provision falling within the court's admiralty jurisdiction. In contrast, the present Contract's provisions concerning demurrage charges, as described supra, assign to the Buyer the obligation for demurrage charges and specify other maritime-related conditions and obligations that touch upon concerns relating to the "protection of maritime commerce." Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 608 (1991).

17

Because Plaintiff's claim for demurrage constitutes a maritime claim severable from the "non-maritime" portions of the sales contract, it falls within the admiralty jurisdiction of this Court. Subject matter jurisdiction over Plaintiff's claim has therefore been established.

## II. KULBERG FAILS TO ESTABLISH A PRIMA FACIE MARITIME CLAIM UNDER ENGLISH LAW

On a motion under Rule E(4)(f) to vacate an attachment, the plaintiff bears the burden of establishing the existence of a valid prima facie admiralty claim against the defendant. See Aqua Stoli, 460 F.3d at 445; Dolco Inv., Ltd. v. Moonriver Dev., Ltd., 486 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2007) (noting that the majority of courts in the district have applied the "prima facie standard when considering the adequacy of the claim in a maritime vacatur motion"); Chiquita Int'l Ltd. V.M. v. Bosse, 518 F. Supp. 2d 589, 597 (S.D.N.Y. 2007); Eitzen Sealift A/S v. Cementos Andinos Dominicanos SA, No. 05 Civ. 4550 (DC), 2005 WL 2218025, at *2 (S.D.N.Y. Sept. 9, 2005). As numerous courts have recognized, the existence of a valid prima facie admiralty claim turns on the applicable

substantive law – here, the law of the contract. See T&O
Shipping, Ltd. v. Lydia Mar Shipping Co. S.A., 415 F. Supp.
2d 310, 314 (S.D.N.Y. 2006) ("[T]he law of the contract
applies to the question of whether a claim has accrued."),
overruled on other grounds by Aqua Stoli, 460 F.3d at 446;
Penguin Maritime Ltd. v. Lee & Muirhead Ltd., 588 F. Supp.
2d 522, 526-27 (S.D.N.Y. 2008) (applying Indian law in
considering the existence of a valid prima facie admiralty
claim); Precious Pearls, Ltd. v. Tiger Int'l Line Pte Ltd.,
No. 07 Civ. 8325 (JGK), 2007 U.S. Dist. LEXIS 58453, at *5-
6 (S.D.N.Y. July 31, 2008) (applying English law to
determine the existence of a valid maritime claim where the
charter party specified that English law would govern);
Sonito Shipping, 478 F. Supp. 2d at 536-37 (same).

        The parties do not dispute that English law
provides the substantive law governing the terms of the
contract.  The affidavit of Robert Jardine-Brown, submitted
in support of Spark's Motion to Vacate, establishes that
under English law Plaintiff's claim "is not a claim in
respect of which the admiralty jurisdiction of the English
High Court could be invoked."  Jarine-Brown Decl. ¶ 13.
Plaintiff has not presented any evidence, either through
counsel during oral argument or the Markelov Declaration

accompanying Spark's opposition, that refutes this
characterization of English law. Moreover, the parties'
agreement that disputes arising under the Contract were to
be arbitrated by GAFTA, and not the London Maritime
Arbitration Association ("LMAA") as is customary for true
maritime claims, is consistent with an understanding that
English law does not view the present claim as "maritime."
See, e.g., Aston, 2006 WL 3755156 at *13 n.5 (citing fact
that parties' contract specified arbitration before GAFTA
rather than a maritime arbitration body in concluding no
maritime claim existed); cf. Stemcor, 2009 U.S. Dist. LEXIS
42855 at *7 (finding agreement by parties to arbitrate
before a maritime tribunal indicative of parties' view that
contract pertained to maritime commerce); Crossbow Cement,
2008 WL 5101180, at *6 (noting contract called for dispute
resolution by LMAA rather than GAFTA in concluding claim in
question was maritime claim).

Spark has failed to meet its burden of
establishing the existence of a valid prima facie admiralty
claim under English law. Consequently, the Rule B
attachment must be vacated.

## CONCLUSION

20

For the reasons set forth above, Defendants'

motion to vacate the order of maritime attachment is

granted. Plaintiff is directed to immediately release

Defendants' attached funds and is barred from seeking

further attachment of Defendants' funds pursuant to the

vacated attachment.

It is so ordered.

New York, N.Y.
June    / 7, 2009

ROBERT W. SWEET

U.S.D.J.

21